

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,237

### Ex parte YOKAMON LANEAL HEARN, Applicant

## ON APPLICATION FOR A WRIT OF HABEAS CORPUS
## FROM DALLAS COUNTY

**JOHNSON, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

Applicant, Yokamon Laneal Hearn, was convicted of capital murder and sentenced to death. In this subsequent application for habeas corpus, applicant asserts that he is mentally retarded and, pursuant to the United States Supreme Court holding in *Atkins v. Virginia,* 536 U.S. 304 (2002), constitutionally exempt from a death sentence.

In our statutes and case law, "mental retardation" is defined by: (1) significantly subaverage general intellectual functioning; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. *Ex parte Briseno*, 135 S.W. 3d 1, 7 n.26 (Tex. Crim. App. 2004) (citing AMERICAN ASSOCIATION OF MENTAL RETARDATION (AAMR), MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORT 5 (9th ed. 1992)). *See also*

AMERICAN ASSOCIATION ON MENTAL DEFICIENCY (AAMD), CLASSIFICATION IN MENTAL RETARDATION 1 (GROSSMAN ED. 1983). The issue before this court is whether alternative assessment measures can be substituted for full-scale IQ scores in supporting a finding of subaverage intellectual functioning. We hold that alternative assessment measures can not be substituted for full-scale IQ scores.

**Procedural History**

In December 1998, applicant was convicted of capital murder and sentenced to death. This Court affirmed his conviction and sentence,[1] and the United States Supreme Court denied his petition for writ of certiorari.[2]

While his appeal was pending in this Court, applicant filed his initial application for writ of habeas corpus in the 282nd District Court of Dallas County (state district court). That court recommended that all relief be denied. *Ex parte Hearn*, No. W98-46232-S(A) (282nd Dist. Ct., Dallas County, Aug. 1, 2001). Upon review of the record, this Court denied relief in an unpublished order. *Ex parte Hearn*, No. 50,116-01 (Tex. Crim. App. Nov. 14, 2001).

Subsequently, applicant sought habeas corpus relief from his conviction and sentence in federal court. The United States District Court for the Northern District of Texas (federal district court) denied relief on his application for writ of habeas corpus. *Hearn v. Cockrell*, 2002 WL 1544815 (N.D. Tex. July 11, 2002). Thereafter, the United States Court of Appeals for the Fifth

---

[1] *Hearn v. State*, No. 73,371, slip op. (Tex. Crim. App. Oct. 3, 2001).

[2] *Hearn v. Texas*, 535 U.S. 991 (2002).

Circuit (Fifth Circuit)[3] and the United States Supreme Court[4] each refused applicant's petitions for review.

After the United States Supreme Court refused applicant's petition for writ of certiorari, applicant's counsel concluded her representation of applicant. Applicant then sought the help of the Texas Defender Service. In March 2004, with the assistance of the Texas Defender Service attorneys, applicant filed a motion for stay of execution and appointment of counsel to assist him in investigating an *Atkins* claim. We denied both requests, finding that applicant failed to make a *prima facie* showing of mental retardation. *Ex parte Yokamon Laneal Hearn*, No. 50,116-02 (Tex. Crim. App. Mar. 3, 2004).

At about the same time, in the federal district court, applicant moved for appointment of counsel and stay of execution. The federal district court transferred the motions to the Fifth Circuit *sua sponte*. Applicant then filed a separate notice of appeal, asking the Fifth Circuit to reverse the order, appoint counsel, and stay the execution. The Fifth Circuit granted a stay of execution in order to determine whether applicant was entitled to counsel and services under 21 U.S.C. § 848(q). It held that applicant was entitled to such counsel, granted applicant's request for appointment of counsel, and remanded his case to the federal district court. *In re Hearn and Hearn v. Dretke*, 376 F.3d 447 (5th Cir. 2004), *reh. denied,* 389 F.3d 122 (5th Cir. 2004).

On remand, the federal district court held that applicant had not made a showing of mental retardation, as is required in order to proceed on his successive *habeas corpus* petition. *Hearn v. Quarterman*, 2007 WL 2809908 (N.D. Tex. Sep. 27, 2007). Applicant then filed a Rule 59(e)

---

[3] *Hearn v. Dretke*, 73 Fed.Appx. 79 (5th Cir. Jun. 23, 2003).

[4] *Hearn v. Dretke*, 540 U.S. 1022 (2003).

motion to vacate the judgment and supported that motion with two new expert reports. After reviewing these reports, the federal district court held that applicant did make a *prima facie* case for an *Atkins* claim and stayed the federal proceedings to allow applicant to present his *Atkins* claim to the state court. *Hearn v. Quarterman*, 2008 WL 3362041 (N.D. Tex. Aug. 12, 2008).

In October 2008, applicant filed, in the state district court, a subsequent application that is based on an *Atkins* claim and seeks post-conviction relief from his death sentence. It was forwarded to this Court in June 2009. In September 2009, the Court filed and set this case in order to determine whether alternative-assessment measures can be substituted for full-scale IQ scores in supporting a finding of subaverage intellectual functioning.

## Applying *Atkins*

In *Atkins*, the Supreme Court held that executing persons who are mentally retarded is a violation of the Eighth Amendment. *Atkins*, 536 U.S. at 320. The Supreme Court "le[ft] to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id*. at 317. Post-*Atkins*, we have received a significant number of habeas corpus applications from death row inmates who allege they suffer from mental retardation and are therefore exempt from execution. "This Court does not, under normal circumstances, create law. We interpret and apply the law as written by the Texas Legislature or as announced by the United States Supreme Court." *Briseno*, 135 S.W.3d at 4. However, the Texas Legislature has not yet enacted legislative guidelines for enforcing the *Atkins* mandate. Consequently, we have set out guidelines by which to address *Atkins* claims until the legislature acts. *Briseno*, 135 S.W.3d at 4.

In *Briseno* we announced that "[u]ntil the Texas Legislature provides an alternate statutory definition of 'mental retardation,' . . . we will follow the AAMR or section 591.003(13) of the Texas

Health and Safety Code criteria in addressing *Atkins* mental retardation claims."[5] *Briseno*, 135 S.W.3d at 8. The AAMR defines mental retardation as a disability characterized by: (1) significantly subaverage general intellectual functioning; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18.[6] *Briseno*, 135 S.W. 3d at 7 n.26 (citing AAMR at 5). *See also* AAMD at 1.

Determining whether one has significantly subaverage intellectual functioning is a question of fact. It is defined as an IQ of about 70 or below.[7] AMERICAN PSYCHIATRIC ASSOCIATION DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (DSM-IV). There is "a measurement error of approximately 5 points in assessing IQ," which may vary from instrument to instrument.[8] *Id*. Thus, any score could actually represent a score that is five points higher or five points lower than the actual IQ. *Id.; see also Wilson v. Quarterman*, 2009 WL 900807 *4 (E.D. Tex. Mar. 31, 2009).

The IQ score is not, however, the exclusive measure of mental retardation. A finding of mental retardation also requires a showing of "significant limitations in adaptive functioning." DSM-IV at 41. According to the AAMR, three adaptive-behavior areas are applicable to

---

[5] According to § 591.003(13) of the Texas Health and Safety Code, mental retardation "means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEATH & SAFETY CODE § 591.003(13).

[6] A jury determination of mental retardation is not required. *Briseno*, 135 S.W.3d at 9.

[7] General intellectual functioning is defined by the intelligence quotient (IQ). It is obtained by assessment with a standardized, individually administered intelligence test (i.e. Wechsler Intelligence Scales for Children, 3rd Edition; Stanford-Binet, 4th Edition; and Kaufman Assessment Battery for Children). DSM-IV at 41.

[8] A Wechsler IQ score of 70 would represent a score range of 65 to 75. DSM-IV at 41.

determining mental retardation: conceptual skills, social skills, and practical skills.[9] Limitations in adaptive behavior can be determined by using standardized tests.[10] According to the DSM-IV, "significant limitation" is defined by a score of at least two standard deviations below either (1) the mean in one of the three adaptive behavior skills areas or (2) the overall score on a standardized measure of conceptual, social, and practical skills. *Id.* Although standardized tests are not the sole measure of adaptive functioning, they may be helpful to the factfinder, who has the ultimate responsibility for determining mental retardation.

In addition to demonstrating that one has subaverage intellectual functioning and significant limitations in adaptive functioning, he or she must demonstrate that the two are linked–the adaptive limitations must be related to a deficit in intellectual functioning and not a personality disorder. To help distinguish the two, this court has set forth evidentiary factors that "fact-finders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder."[11] *Briseno*, 135 S.W.3d at 8.

---

[9] Conceptual skills include skills related to language, reading and writing, money concepts, and self-direction. Social skills include skills related to interpersonal relationships, responsibility, self-esteem, gullibility, naivete, following rules, obeying laws, and avoiding victimization. Practical skills are skills related to activities of daily living and include occupational skills and maintaining a safe environment. AAMR at 82.

[10] Several scales that have been designed to measure adaptive functioning: Vineland Adaptive Behavior Scales, the AAMR Adaptive Behavior Scale, the Scales of Independent Behavior, and the Adaptive Behavior Assessment System. DSM-IV at 42; *Ex parte Woods*, 296 S.W.3d 587, 596-97 (Tex. Crim. App. 2009); *Hunter v. State*, 243 S.W.3d 664 at 670-71 (Tex. Crim. App. 2007).

[11] This court has set forth the following evidentiary factors:

> Did those who knew the offender during the developmental stage–his family, friends, teachers, employers, authorities–think he was mentally retarded at that time, and, if so, act in accordance with that determination?
>
> Has the person formulated plans and carried them through or is his conduct impulsive?
>
> Does his conduct show leadership or does it show that he is led around by others?

**Applicant's *prima facie* case for mental retardation**

In 2005, defense psychologist Dr. Alice Conroy administered a WAIS-III test to applicant; applicant obtained a full-scale IQ score of 74. Defense expert Dr. James Patton concluded that applicant's full scale IQ score of 74 was within the standard error of measurement.[12] Therefore, applicant argues that because his IQ score of 74 is within the standard error of measurement, he has met the requirement of significant subaverage intellectual functioning.

However, three additional IQ test scores yielded results that are materially above 70. In January 2007, the district court held an evidentiary hearing on applicant's *Atkins* claim. In preparation for the hearing, the two state experts administered the WAIS-III and Stanford-Binet Intelligence Scales (5th Edition). Applicant's resulting full-scale IQ scores on those tests were 88 and 93 respectively.[13]

The defense then asked Dr. Dale G. Watson to review applicant's previous test results. As a part of his evaluation of applicant's mental health, Dr. Watson administered an additional IQ test

---

Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

Does he respond coherently, rationally, and on point to oral and written questions or do his responses wander from subject to subject?

Can the person hide facts or lie effectively in his own or others' interests?

Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning and complex execution of purpose?

*Briseno*, 135 S.W.3d at 8-9.

[12] Dr. Watson specifically stated that applicant's full-scale score of 74 is "in the IQ range that can be considered *approximately* two standard deviations below the mean of 100." Applicant's Habeas Application, Ex. 2 at 46.

[13] An entry in the clinic notes of the Texas Department of Criminal Justice-institutional division on January 5, 1999, notes that applicant's estimated full-scale IQ on a WAIS-R short-form test was 82.

using the Woodcock Johnson Test of Cognitive Abilities (3ʳᵈ Edition); applicant's resulting full-scale IQ score on that test was 87. *Id.* After reviewing applicant's results on that test, Dr. Watson found that it did not demonstrate subaverage intellectual functioning, but did demonstrate deficits in adaptive behavior.[14] In an effort to better understand the inconsistency between applicant's above-70 full-scale IQ scores and his significant deficits in adaptive functioning, Dr. Watson administered a neuropsychological test battery. After reviewing the results, Dr. Watson concluded that applicant's neuropsychological deficits "appear" to underlie previous findings of deficits in adaptive functions, and are "likely" developmental in nature.

The defense then asked Dr. Stephen Greenspan to consider whether neuropsychological deficits such as those revealed by neuropsychological testing of applicant could satisfy the requirement of significantly subaverage general intellectual functioning, despite full-scale IQ scores ranging from 87 to 93. Dr. Greenspan opined that substituting neuropsychological measures for full-scale IQ scores is "justified when there is a medical diagnosis of a brain syndrome or lesion, such as Fetal Alcohol Spectrum Disorder . . . because it is well known that such conditions cause a mixed pattern of intellectual impairments that, while just as serious and handicapping as those found in people with a diagnosis of MR, are not adequately summarized" by full-scale IQ scores.[15] Dr. Greenspan concluded that, under a more expansive definition of mental retardation, applicant could

---

[14] Dr. Watson testified that there were errors in the scoring of the WAIS-III completed by Dr. Conroy and the WAIS-III completed by Dr. Price. None of the errors changed any score by more than one point.

[15] Dr. Pablo Stewart previously found that applicant suffers from Fetal Alcohol Syndrome and Dr. Greenspan adopted this finding in conducting his evaluation of applicant's mental health. Applicant's Habeas Application, Ex. 4 at 64-65. Dr. Greenspan also noted that, in the past, other experts have argued that "full-scale IQ is not an adequate indicator of significant intellectual impairment in someone with brain damage," and that extremely deficient verbal IQ could be a better index. *Id.* at 11-12 (discussing *People v. Superior Court (Vidal)*, 155 P.3d 259 (Cal. 2007)).

establish a mental-retardation claim.

In view of all the evidence, applicant argues that he is mentally retarded. He notes that, in spite of the new IQ test results, Dr. Patton concluded that applicant is mentally retarded. "Neuropsychological testing, together with the diagnosis of fetal alcohol syndrome, has demonstrated that the significant limitations I have identified in Mr. Hearn's adaptive behavior are, nevertheless, a product of intellectual deficits. . . . I am satisfied that Mr. Hearn has mental retardation." *Id*.

In making his *Atkins* claim, applicant asks this Court to significantly alter the current definition of mental retardation. Applicant correctly notes that the assessment of "about 70 or below" is flexible; "[s]ometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded."[16] *Briseno*, 135 S.W.3d at 7 n.24 (citing AAMD at 23). Applicant, however, misconstrues this language to mean that clinical judgment can completely replace full-scale IQ scores in measuring intellectual functioning.

This court has expressly declined to establish a "mental retardation" bright-line exemption from execution without "significantly greater assistance from the [] legislature." *Briseno*, 135 S.W.3d at 6. Instead, this court interprets the "about 70" language of the AAMR's definition of mental retardation to represent a rough ceiling, above which a finding of mental retardation in the capital context is precluded.[17]

---

[16] The AAMD states that, "[t]he maximum specified IQ is not to be taken as an exact value, but as a commonly accepted guideline" and that "clinical assessment must be flexible." AAMD at 22.

[17] *See, e.g., Ex parte Woods*, 296 S.W.3d at 608 n.35 & 36; *Williams*, 270 S.W.3d at 132 ; *Neal v. State*, 256 S.W.3d 264, 273 (Tex. Crim. App. 2008); *Hunter*, 243 S.W.3d at 671; *Gallo v. State*, 239 S.W.3d 757, 771 (Tex. Crim. App. 2007); *Ex parte Blue*, 230 S.W. 3d 151, 165 (Tex. Crim. App. 2007); *Ex parte Lewis*, 223 S.W.3d 372,

In the present case, applicant attempts to use neuropsychological measures to wholly replace full-scale IQ scores in measuring intellectual functioning.[18] However, this court has regarded non-IQ evidence as relevant to an assessment of intellectual functioning only where a full-scale IQ score was within the margin of error for standardized IQ testing.[19] Thus, we hold that, while applicants should be given the opportunity to present clinical assessment to demonstrate why his or her full-scale IQ score is within that margin of error, applicants may not use clinical assessment as a replacement for full-scale IQ scores in measuring intellectual functioning.

The evidence before us in this application does not demonstrate significantly subaverage intellectual functioning by applicant. Accordingly, we dismiss the application.

Delivered: April 28, 2010
Publish

---

378 n.21 (Cochran, J. concurring) (Tex. Crim. App. 2006); *Hall v. State*, 160 S.W.3d 24, 36 (Tex. Crim. App. 2004); *Briseno*, 135 S.W.3d at 14 n.53. *Compare, Ex parte Van Alstyne,* 239 S.W.3d 815 (Tex. Crim. App. 2007); *Ex parte Bell,* 152 S.W.3d 103 (Tex. Crim. App. 2004); *Ex parte Modden*, 147 S.W.3d 293 (Tex. Crim. App. 2004).

[18] In support, applicant cited Dr. Greenspan's conclusion that substituting neuropsychological measures for full-scale IQ in cases of apparent brain damage "is justified when there is a medical diagnosis of a brain syndrome or lesion, such as Fetal Alcohol Spectrum Disorder." Applicant's Habeas Application, Ex. 4 at 68.

[19] In *Hunter*, the expert discussed the band of confidence for the particular IQ test implemented and how applicant's mild depression and having been handcuffed at the time of taking an IQ test may have affected his score. *Hunter*, 243 S.W.3d at 670.