# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
June 27, 2014

Lyle W. Cayce
Clerk

No. 13-70034

JUAN MARTIN GARCIA,

Petitioner – Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent – Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, SMITH, and CLEMENT, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Texas death row inmate Juan Martin Garcia requests a certificate of appealability (COA) to appeal the district court's denial of federal habeas relief on his intellectual disability[1] and ineffective assistance of counsel claims. The request for a COA is DENIED.

---

[1] The term "intellectual disability" is used to describe the "identical phenomenon" as the term "mental retardation." *See Hall v. Florida*, 134 S. Ct. 1986 (2014).

No. 13-70034

I.

Garcia was convicted of murdering Hugo Solano during the course of a robbery on September 17, 1998. After he was arrested, Garcia confessed to the crime.

At the punishment phase, the State presented evidence of a crime spree consisting of numerous other armed robberies and shootings committed by Garcia and his accomplices in August and September 1998, both before and after the armed robbery and murder of Solano. The State also presented the testimony of an inmate who claimed that Garcia and a group of other inmates beat him while they were incarcerated together. The defense presented two witnesses to rebut that inmate's testimony. The defense also called Garcia's mother, stepfather, sisters, and wife to testify in mitigation. The victim's widow testified that she had forgiven Garcia and did not want him to receive the death penalty. The defense called as an expert witness Dr. Walter Quijano, a clinical psychologist, to testify about factors that contribute to future dangerousness and security measures used by the Texas prison system to reduce or eliminate the risk of dangerousness in prison. The trial court sentenced Garcia to death after the jury answered the special issue on future dangerousness affirmatively and answered the special issue on mitigation negatively.

The Texas Court of Criminal Appeals (TCCA) affirmed Garcia's conviction and sentence on direct appeal, and the Supreme Court of the United States denied certiorari. *Garcia v. State*, 57 S.W.3d 436 (Tex. Crim. App. 2000), *cert. denied*, 537 U.S. 1195 (2003).

Garcia filed a state habeas application on August 15, 2001. The TCCA denied relief on September 26, 2007. *Ex parte Garcia*, 2007 WL 2790589, No. WR-67,096-01 (Tex. Crim. App. 2007).

No. 13-70034

Garcia filed a petition for writ of habeas corpus in federal court on September 25, 2008. The district court granted Garcia's motion to stay and abate the federal proceedings while he returned to state court to exhaust his intellectual disability claim. Garcia filed a second state habeas application in February 2009. The TCCA held that Garcia's allegations did not satisfy the requirements of Article 11.071, Section 5, of the Texas Code of Criminal Procedure,[2] and dismissed the subsequent application as an abuse of the writ. *Ex parte Garcia*, No. WR-67,096-02 (Tex. Crim. App. Sept. 16, 2009). Garcia filed an amended federal habeas petition on March 1, 2010. The district court denied relief on September 24, 2013, and denied a COA.

## II.

Garcia requests a COA from this court to appeal the denial of relief as to two claims: (1) he is intellectually disabled and thus ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002); and (2) trial counsel rendered ineffective assistance by eliciting testimony from the defense expert, Dr. Quijano, regarding race and ethnicity as factors in determining future dangerousness.

---

[2] Section 5 of Article 11.071 provides:

Sec. 5. (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.

No. 13-70034

To obtain a COA, Garcia must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. In making the decision whether to grant a COA, this Court's examination is limited to a "threshold inquiry," which consists of "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 327, 336. This Court cannot deny a COA because it believes that Garcia ultimately will not prevail on the merits of his claims. *Id.* at 337. On the other hand, "issuance of a COA must not be *pro forma* or a matter of course." *Id.* "While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (brackets, internal quotation marks, and citations omitted).

We now turn to address Garcia's COA requests, beginning with his intellectual disability claim.

## A. *Atkins* claim

Garcia argues that he is entitled to a COA to appeal the district court's denial of relief on his claim that he is intellectually disabled and thus ineligible for execution.

Garcia presented his intellectual disability claim for the first time in his second state habeas application. In that application, Garcia's counsel alleged

4

that he had interviewed Garcia, his family, and his friends, and had reviewed Garcia's "extremely poor school record." The application cites Garcia's mother's trial testimony that he was a slow learner who was enrolled in special education classes. The application also alleges that

> The evidence shows that he has significant limitations in his adaptive functioning and that he exhibited these diagnostic features before the age of 18. Recent interviews with Garcia, his family, and his friends have revealed significant deficits in adaptive functioning beyond the revelations at trial that he had been in special education classes and was unable to read or write.

The application also states that counsel "is applying" to the state court for funding for intelligence quotient (IQ) testing and investigation. The application concludes with a request that the state court find that the application satisfies Section 5 of Article 11.071 and remand the case to the trial court with instructions to appoint counsel and provide funds necessary to obtain appropriate investigative and expert assistance.

The application is not accompanied by any evidence. There are no affidavits from friends or family members interviewed by counsel, no school records, and no IQ test scores, notwithstanding the fact that four IQ scores were available when the application was filed. The record contains no application to the state court for funding for expert assistance or IQ testing, and Garcia does not complain that such an application was made and denied.

The TCCA dismissed the second state application as an abuse of the writ, stating that it had reviewed the application and found that the allegations did not satisfy the requirements of Article 11.071, Section 5.

In federal court, Garcia supported his *Atkins* claim with evidence that he did not present in state court, including five IQ scores (four of which were available when his state writ was filed), and sworn statements from siblings, an ex-girlfriend, and a childhood teacher. He alleged that he was examined by

5

No. 13-70034

Dr. Martinez on October 15, 2009, and obtained a full-scale IQ score of 75 on the Wechsler Adult Intelligence Scales IV. He obtained an IQ score of 100 on a TONI-2 assessment on July 22, 1993, when he was 13 years old, a score of 91 on a TONI-2 assessment on January 13, 1996, at age 15, a score of 83 on a TONI-3 assessment on June 21, 2000, and a score of 83 on the WISC-III on January 25, 1995, when he was 14 years old. Counsel alleged that all of these scores should be disregarded because they are not as reliable as the Wechsler and because it was unknown whether proper protocol was followed in the administration and scoring of the tests.

The federal petition alleged that school records showed that Garcia was several grade levels behind in his classes, he repeated third grade, and was placed in special education classes. In addition, middle school records indicated that he remained in special education classes for all of his core subjects.

Garcia alleged adaptive deficits in conceptual skills, social skills, and practical skills. His elementary school special education teacher, Angela Costigan, stated in her declaration that Garcia did not have conversational skills, he could not communicate because he lacked a vocabulary, his reading was at a first or second grade level, he was placed in special education not only because of academics, but also because he was unable to socialize on the same level as other children, he did not understand the difference between addition and subtraction, he was not capable of making a decision, he never initiated projects, he did not respond well when things did not go as planned, he could not tolerate failure, he would not complete difficult tasks, he would respond with anger and destructiveness when he did not understand things, he was incapable of thinking on an abstract level, he was a loner, he lacked self-esteem, he tried to hide the fact that he did not know how to do simple things

6

so as to avoid looking stupid, and he was incapable of seeing the long-term consequences of his actions.

The declaration of federal habeas counsel's investigator states that Garcia's cousin, Patricia McBen, told the investigator that Garcia had trouble explaining things in words, that he did not understand when others tried to explain things to him, that he had trouble understanding the consequences of his actions, that he was extremely gullible as a child, that he often got in trouble for doing the wrong things and was beaten by his stepfather because he did not know the right things to do, that he did not follow rules or directions because he did not understand what he was supposed to do, that he was unable to follow simple directions for cooking, that he had a poor concept of time, and that he was simple-minded and impulsive.

Garcia's younger sister, Alexandra Garcia, stated in her declaration that he was so easily distracted that he would stop talking to people in the middle of a conversation, that he did not sleep well, that he was unable to make friends and socialize on the same level as other children, that other students, including in his special education class, made fun of him and called him names, that others could get him to do whatever they wanted, even if he thought it would cause him to get hurt or get into trouble, and that he was not able to read or write until he was 17 or 18 years old.

Garcia's older sister, Priscilla Zamora, stated in her declaration that Garcia was always scared, that he had problems sleeping, that he would get frustrated and give up when he could not complete a math problem, and that he was unable to read or write.

The district court rejected the State's contention that Garcia's *Atkins* claim was procedurally defaulted. Instead, it held that the TCCA rejected Garcia's *Atkins* claim on the grounds that he failed to make a prima facie showing that he is intellectually disabled, which is a merits determination.

Although the TCCA dismissed Garcia's second habeas application as an abuse of the writ, this court has held that

> in the *Atkins* context, Texas courts have imported an antecedent showing of 'sufficient specific facts' to merit further review, rendering dismissal of such claims [as abuses of the writ] a decision on the merits. . . . Thus, a decision that an *Atkins* petition does not make a prima facie showing—and is, therefore, an abuse of the writ—is not an independent state law ground.

*Rivera v. Quarterman*, 505 F.3d 349, 359 (5th Cir. 2007) (internal citations and quotation marks omitted).

Under Texas law, "[intellectual disability] is a disability characterized by: (1) significantly subaverage general intellectual functioning"; "(2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Blue v. Thaler*, 665 F.3d 647, 657–58 (5th Cir. 2011) (citing *Ex parte Briseno*, 135 S.W.3d 1, 7–8 (Tex. Crim. App. 2004)). The TCCA has defined significant "subaverage intellectual functioning . . . as an IQ of about 70 or below." *Ex parte Hearn*, 310 S.W.3d 424, 428 (Tex. Crim. App. 2010). The TCCA has recognized that because IQ tests have a standard error of measurement of approximately five points, "any score could actually represent a score that is five points higher or five points lower than the actual IQ." *Id.* With respect to limitations in adaptive functioning, the TCCA has stated that "three adaptive-behavior areas are applicable to determining [intellectual disability]: conceptual skills, social skills, and practical skills." *Id.* Further, the TCCA requires that "the adaptive limitations must be related to a deficit in intellectual functioning and not a personality disorder." *Id.*

We have held that "when a petitioner makes a prima facie showing of mental retardation, a state court's failure to provide him with an opportunity to develop his claim deprives the state court decision of deference ordinarily due under . . . AEDPA." *Blue,* 665 F.3d at 656. However, states are not

required to "give hearings to all persons with *Atkins* claims" because "states [have] discretion to set gateways to full consideration and to define the manner in which habeas petitioners may develop their claims." *Id.* at 657.

The district court held that Garcia's *Atkins* claim fails, whether reviewed de novo or under the AEDPA reasonableness standards, because Garcia failed to demonstrate that he has significantly subaverage intellectual functioning.

After reviewing the relevant record and evidence, we conclude that reasonable jurists would not debate the district court's conclusion that the TCCA rejected Garcia's *Atkins* claim because he failed to make a prima facie showing of intellectual disability. In his state habeas application, Garcia presented no IQ scores, even though four were readily available to him. Moreover, he made only conclusory allegations of deficits in adaptive functioning, unsupported by any affidavits, even from readily accessible family members. Although his application cites his mother's trial testimony that he was a slow learner who was enrolled in special education classes, the mother also testified at trial that Garcia is "not retarded" and that she eventually took him out of school because he stopped attending classes.

Furthermore, reasonable jurists also would not debate the district court's alternative resolution of this claim under de novo review because, even considering the evidence Garcia presented for the first time in federal court, Garcia failed to demonstrate that he has significantly subaverage intellectual functioning. The district court observed that although on a post-conviction IQ test, Garcia scored 75, which falls just within the margin of generally recognized testing error of five points, his actual IQ is as likely to be 80 as it is to be 70. The district court noted that the fact that his four other, pre-conviction, IQ scores ranged from 83 to 100 indicated that his actual IQ is likely higher than 75. Accordingly, Garcia failed to show that his alleged deficits in

adaptive behaviors are related to subaverage intellectual functioning, rather than psychological or environmental factors or a personality disorder.

Nor does the Supreme Court's recent decision in *Hall v. Florida*, 134 S. Ct. 1986 (2014), cast doubt on our assessment of the debatability of the district court's decision.  In *Hall*, the Court declared unconstitutional a Florida statute that had been interpreted by the Florida Supreme Court as establishing an IQ score of 70 as a mandatory cutoff, such "that a person whose test score is above 70, including a score within the margin for measurement error, does not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited."  *Id.* at 1994.  The Court concluded that "an individual with an IQ test score 'between 70 and 75 or lower,' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning."  *Id.* at 2000 (internal citation omitted).  Texas does not preclude individuals with an IQ score between 70 and 75 from presenting additional evidence of difficulties in adaptive functioning in support of an intellectual disability claim.  Garcia simply failed to produce any evidence at all in the state court proceedings, and the evidence he presented for the first time in federal court fails to present a debatable *Atkins* claim of intellectual disability.

We now turn to consider Garcia's claim regarding Dr. Quijano's testimony about race and ethnicity as a statistical factor for future dangerousness.

### B.  Ineffective Assistance of Counsel Claim

Garcia contends that he is entitled to a COA for his claim that trial counsel rendered ineffective assistance by choosing Dr. Quijano as their classification expert and eliciting testimony from him about race and ethnicity as factors for determining future dangerousness.

No. 13-70034

On direct examination, Dr. Quijano testified that statistical factors that are predictive of future dangerousness include past violent behavior, the age and gender of the defendant (older defendants are less likely to be violent in the future and male defendants are more likely than female defendants to be violent), socio-economic status, the lack of steady employment, the use of a weapon, and the use of drugs or alcohol. Defense counsel then asked Dr. Quijano whether race plays a role. He responded: "The race plays a role in that the – among dangerous people, minority people are overrepresented in this population. And, so, blacks and Hispanics are overrepresented in the . . . so-called dangerous population." Defense counsel then asked whether some of those factors were eliminated in a prison environment, to which Dr. Quijano responded that "[m]ost of these factors are either eliminated or kept to a minimum, reduced to a minimum within the prison setting. Those factors that are biographical [sic] are, of course, not eliminated, your gender and your race."

The bulk of Dr. Quijano's testimony, however, described the conditions under which Garcia would serve a life sentence, the security measures available in the Texas prison system, and how such measures were effective in eliminating or reducing the risk of violence. He testified about a videotape of a visit to the Texas Department of Criminal Justice Michael Unit on March 4, 1999, which he directed, to illustrate some of the safety measures that the prison system uses in the higher level security areas of the prison. The videotape was admitted into evidence and shown to the jury. Dr. Quijano stopped and explained various aspects of the security measures during the showing of the videotape.

On direct appeal, Garcia argued that his trial counsel rendered ineffective assistance by eliciting the testimony about race and ethnicity from Dr. Quijano. The TCCA held that Garcia failed to demonstrate that his trial counsel's performance fell below an objective standard of reasonableness. The

court stated that counsel might have been attempting, with Dr. Quijano's testimony, to do two things: (1) place before the jury all the factors it might use against Garcia, either properly or improperly, in its assessment of his future dangerousness and (2) persuade the jury that, despite all of those negative factors, Garcia would not be a future danger if imprisoned for life because the prison system's procedures and techniques would control or eliminate his tendency toward violence. The court stated that in the light of the State's evidence of Garcia's long and violent criminal record,[3] it could not say that counsel's conduct could not be considered sound trial strategy.

Garcia raised the claim again in his first state habeas application. In its response, the State submitted an affidavit from lead trial counsel, Ron Hayes. Hayes stated in his affidavit that the defense hired Dr. Quijano to testify as an expert on the Texas prison system and how the prison system worked to demonstrate that Garcia would not be a future danger if he were given a life sentence. Hayes stated that he had reviewed Dr. Quijano's trial testimony and that Dr. Quijano did not testify that Hispanics or African Americans were more dangerous, just that they were overrepresented, something that can occur if a group is not treated the same or as fairly as other groups. He stated that Dr. Quijano's testimony (76 pages of direct testimony and 38 pages of cross-examination) is centered on how the prison system can work to alleviate

---

[3] The TCCA described the evidence of future dangerousness at trial as follows: (1) on June 24, 1992, when Garcia was 12 years old, he committed the offense of terroristic threat; (2) on May 6, 1993, when Garcia was 13 years old, he committed misdemeanor theft; (3) on August 31, 1998, when Garcia was 18 years old, he committed three separate aggravated robberies; (4) on September 15, 1998, Garcia again committed aggravated robbery; (5) on September 17, 1998, Garcia shot and killed Hugo Solano during the course of a robbery; (6) on the same day he murdered Solano, Garcia also committed two aggravated robberies; (7) on September 20, 1998, Garcia committed aggravated robbery and attempted capital murder; (8) on September 21, 1998, Garcia committed aggravated robbery and attempted capital murder; and (9) in November 1999, while incarcerated in the Harris County Jail awaiting trial, he committed misdemeanor assault.

dangerousness. He noted that in closing arguments, counsel relied on Dr. Quijano's testimony as to where Garcia would be housed in prison if he got a life sentence and to argue that the set-up of the prison system would prevent Garcia from being a danger. He concluded that the defense strategy in presenting Dr. Quijano's testimony as to give the jury as much information as possible about the future dangerousness special issue and about the prison system and how prison structure can decrease or eliminate dangerousness.

The state habeas trial court found that Dr. Quijano testified extensively about the structure of prison controlling or eliminating many dangerousness factors, the difference in behavior when someone is strictly supervised, the prison system's knowledge of an inmate's prior behavior and history, the prison classification system and accompanying tests and standards, the prison's interest in safety and rehabilitation, and how a lengthy sentence "institutionalizes" an inmate so that he is not as dangerous as an inmate serving a shorter sentence. The court found that Dr. Quijano did not testify that Garcia was more dangerous because he is Hispanic or that Hispanics are more dangerous than other groups, and that Dr. Quijano's brief remarks about "blacks and Hispanics" being overrepresented could have been interpreted as indicating that the criminal justice system was unfair to them. The court found that the prosecution did not question Dr. Quijano about his testimony concerning overrepresentation; that neither side's counsel referred to Dr. Quijano's brief remarks during punishment argument; and that defense counsel's punishment argument emphasized Dr. Quijano's extensive testimony about the prison system's ability to lessen or eliminate a person's dangerousness. The court found, based on the credible affidavit of Hayes, that counsel presented Dr. Quijano to testify as an expert on the Texas prison system and its security measures and classifications and to show how the prison system can work to alleviate dangerousness. The court found that trial

counsel did not perform deficiently by employing the reasonable trial strategy of presenting as much evidence as possible concerning the safety of prison and its stabilizing effects on long-term inmates, especially in the light of the extensive punishment evidence of Garcia's violent conduct.

The state habeas trial court held, in the alternative, that Garcia failed to demonstrate prejudice because Dr. Quijano's comment concerning overrepresentation was an isolated remark among extensive testimony about the security measures and classification system of prison, and because of the lack of questioning by either trial counsel or the State about such comment, the non-specific nature of such comment, and the lack of jury argument concerning such comment.

The TCCA found the claim procedurally barred because it had been raised and rejected on direct appeal.  Alternatively, it adopted the trial court's findings and conclusions and rejected the claim on the merits.

The district court rejected the State's contention that this claim is procedurally defaulted.  It held that although the TCCA held that the claim was procedurally barred because it had been raised and rejected on direct appeal, the claim was nevertheless exhausted when Garcia presented it on direct appeal.

The district court held that in the light of the State's extensive evidence of Garcia's history of violent conduct, including evidence that Garcia committed multiple robberies, assaults, and shootings, the state court reasonably concluded that Dr. Quijano's isolated comment about race and ethnicity was not harmful, i.e., that there is not a reasonable probability that the result would have been different had Dr. Quijano not so testified.

We conclude that reasonable jurists would not debate the district court's resolution of this claim.  Dr. Quijano did not testify that Hispanics are more likely to be dangerous because of their ethnicity or that Garcia's Hispanic

ethnicity increased the likelihood that he would be dangerous in the future. Instead, he identified race and ethnicity, along with past violent behavior, age, gender, socio-economic status, the lack of steady employment, the use of a weapon, and the use of drugs or alcohol as statistical factors, and pointed out that Hispanics and African-Americans were overrepresented in the criminal justice system. Neither the prosecution nor the defense mentioned race or ethnicity in their arguments to the jury. Considering Dr. Quijano's testimony as a whole, his testimony about how the prison system can decrease or eliminate dangerousness was favorable to Garcia. In the light of the State's overwhelming evidence of future dangerousness, reasonable jurists would not debate the district court's conclusion that there is not a reasonable probability that the jury would have answered the special issues differently in the absence of Dr. Quijano's isolated testimony about race and ethnicity.

### III.

Garcia has failed to make a substantial showing of the denial of a constitutional right. His request for a COA is therefore

DENIED.

15